# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER PERKINS and CALIFORNIA ONCOLOGY OF THE CENTRAL VALLEY MEDICAL GROUP, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> MARYLAND CASUALTY CO., <br><br> Defendant. _____/ | CASE NO. CV-F-08-0687- LJO-SMS <br><br> **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** (Docs. 11, 16) |

## INTRODUCTION

By notice on February 18, 2009, defendant Maryland Casualty Company ("Maryland") moves for summary judgment of plaintiffs' Christopher Perkins ("Dr. Perkins") and the California Oncology of the Central Valley Medical Group, Inc. ("California Oncology") (collectively "Plaintiffs") claim that Maryland had a duty to defend Plaintiffs in an underlying action. Maryland argues that, based on the undisputed facts, Maryland had no duty to defend Plaintiffs in the underlying action. On February 24, 2009, Plaintiffs moved for partial summary judgment against Maryland. Plaintiffs submit that the undisputed facts indicate that Maryland breached its duty to defend. Having considered the parties' memoranda and documents, and for the following reasons, this Court GRANTS Maryland's summary judgment motion and DENIES Plaintiffs' partial summary judgment motion.

## BACKGROUND

**Insurance Agreement**

Maryland insured California Oncology and Dr. Perkins, as an executive officer and director, under a commercial general liability policy, No. PAS 40633860 ("the Policy"). The parties do not dispute that the Policy was in effect during the relevant time period. The Policy's insuring agreement states in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insurance against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.

The Policy defines "personal and advertising injury" as:

> injury, including consequential "bodily injury" arising out of the following offense:
> a. False arrest, detention or imprisonment;
> ...

The Policy contains an Employment-Related Practices Exclusion, which reads:

> This insurance does not apply to:
> "Personal and advertising injury" to:
> (1) A person arising out of any:
>   (A) Refusal to employ that person;
>   (B) Termination of that person's employment; or
>   (C) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person.

**Underlying Action**

The underlying action arises out of a September 7, 2005 argument between California Oncology employees Nina McQuown ("Ms. McQuown") and Cheryl Cardoza ("Ms. Cardoza"). Ms. Cardoza was Ms. McQuown's supervisor. Dr. Perkins supervised them both. On the day in question, Ms. McQuown requested to leave work at a certain time because she had an appointment. Ms. Cardoza did not respond decisively to Ms. McQuown's request to leave. Ms. McQuown made a comment that angered Ms. Cardoza, left the room, and walked into the office's reception area. Ms. Cardoza followed Ms. McQuown to the reception area where they continued the argument. In presenting the following excerpts, the Court focuses on testimony and claims directly related to the issue in this case–whether the facts form the basis of a possible claim for false imprisonment or detention.

According to the police report filed on the day of the incident:

Cardoza began to yell at McQuown and ordered her to go to her office. McQuown did not move so Cardoza yelled even louder and got in her face. When McQuown told Cardoza she was not going to her office Cardoza grabbed her left arm and swung her around towards her office and said "yes you are."

McQuown advised Cardoza that she could not touch her and that she was not going anywhere. Cardoza became even more angry and told McQuown that "if you don't go in my office right now you don't have to worry about coming to work the next day because your [sic] fired.

The next day, September 8, 2005, Ms. Cardoza made a statement to California Oncology's human resources department. According to that report,

Cheryl asked Nina to come into Cheryl's office to discuss and possibly resolve the situation. Nina ignored her and kept walking. Cheryl caught up to her and again asked her to come into her office. Nina again ignored her and kept walking. Cheryl tried to get her to stop and listen by ~~grabbing~~ [handwritten "took"] Nina's arm. Nina complained about being touched and Cheryl let go. Cheryl again asked her to come into her office and again Nina refused....Nina left and also called in sick.

On November 17, 2005, Dr. Michael Kesselman, Ph.D. prepared a report in the course of evaluating Ms. McQuown's claim for worker's compensation benefits. His report contains the following claims by Ms. McQuown:

[Ms. McQuown] then turned and began walking through the double doors.

As she did so, Ms. Cardoza screamed at her, "Nina, come back here!"

Ms. McQuown kept walking. Ms. Cardoza repeated her demand which was now in an even more agitated manner.

Ms. Cardoza then ordered Ms. McQuown, "You get in my damn office right now!" Ms. Cardoza was now screaming and cussing at Ms. McQuown. Ms. McQuown stated, "No, not with the way you are acting."

Ms. Cardoza kept yelling and screaming at Ms. McQuown to get her into the office.

Ms. Cardoza then grabbed Ms. McQuown by the left arm with her right hand. Ms. Cardoza then pulled her toward her and twisted her around again yelling and screaming at her to get into her office. She completely turned Ms. McQuown's back around in grabbing her forcefully.

Ms. McQuown told Ms. Cardoza, "You can't do that Cheryl. You can't touch me like that."

From that point on, Ms. Cardoza continued to just yell and scream for Ms. McQuown to get into her office. Ms. McQuown was fearful for her safety and was confused. She decided to leave to get away from Ms. Cardoza for her own safety.

Ms. McQuown then went to get her purse to leave....She grabbed her things and started to walk away and leave. Ms. McQuown then realized she forgot her purse. She went

3

back to the desk to grab her purse. Meanwhile, Ms. Cardoza was still there yelling and screaming. She does not remember what Ms. Cardoza was yelling and screaming at this point because she was so upset and just wanted to get out of the facility and leave.

On June 5, 2006, Ms. McQuown sent the Equal Employment Opportunity Commission ("EEOC") a letter as a "formal complaint for the purpose of filing a charge of discrimination against" California Oncology. In the EEOC complaint, Ms. McQuown alleges, in relevant part:

> Mrs. McQuown continued through the doors, back toward the desk that she was covering, when Ms. Cardoza screamed at her, "Nina get back here right now!" Ms. McQuown turned around shocked and embarrassed at Ms. Cardoza's loud and aggressive shouting. She again shouted, "Nina, I said get back here right now!" Ms. McQuown was located at the receptionist desk at this point and Ms. Cardoza then charged towards her and stopped toe-to-toe in front of her screaming for her to get into her office now. Ms. McQuown replied that she was not going to go behind closed doors with her. Ms. Cardoza then yelled, "If you don't get in my office right now, don't worry about coming into work tomorrow because you will be fired!"
>
> Ms. Cardoza then grabbed Mrs. McQuown by the upper left arm and pulled her forward with a handful of her upper arm, into which she dug her nails. Ms. Cardoza then jerked Ms. McQuown 180 degrees, facing her towards Ms. Cardoza's office. As the nails and grip Ms. Cardoza were painfully dug into the arms of Ms. McQuown, Ms. Cardoza was repeatedly screaming out profanities. Mrs. McQuown was able to free herself and managed to step around Ms. Cardoza. Mrs. McQuown grabbed her purse and proceeded towards the Pharmacy.

Ms. Quown filed a complaint against Dr. Perkins, California Oncology, and Ms. Cardoza on September 7, 2006 in Fresno County Superior Court. In the complaint, Ms. McQuown asserted causes of action for battery, harassment, wrongful termination, intentional infliction of emotional distress and negligent infliction of emotional distress. Ms. Cardoza filed a cross-complaint against Plaintiffs. Ms. McQuown later filed an amended complaint, which is the operative pleading discussed by the parties. The factual allegation of Ms. McQuown's first amended complaint are:

> 11. Plaintiff was constructively terminated on or about September 7, 2005, because of the harassing conduct of the defendants, Cheryl Cardoza and California Oncology of the Central Valley as set forth below.
> 12. On September 7, 2006[sic], Plaintiff was employed at California Oncology of the Central Valley; she was assaulted and battered by Defendant Cheryl Cardoza.
> 13. Immediately prior to the assault and battery of Plaintiff Nina McQuown, Defendant Christopher Perkins, M.D. told Defendant Cheryl Cardoza to handle Plaintiff any way Defendant Cardoza wanted, including by use of physical force.
> 14. At the time Defendant Cheryl Cardoza committed the assault and battery, she was acting within the express authority to use physical force upon Plaintiff granted to her by Defendant Christopher Perkins, M.D.
> 15. Thereafter, during Plaintiff's employment, she was forced to endure the harassment. Defendants, and each of them, created an oppressive and unbearable work environment for Plaintiff Nina McQuown. All of the conduct alleged herein was unwelcome and offensive to Plaintiff. She was thereafter terminated

4

| | |
|---|---|
| 1 | by California Oncology of the Central Valley. |
| 2 | Ms. Cardoza was deposed on March 13, 2007 and testified as follows: |

A. ...At this point, she was at the receptionist's desk, I walked through the door, and I said, "Nina, what's the problem?"...At this point I look over and there's coworkers and there's patients and patient family members in the lobby. So I said, "Nina, let's go to my office to discuss this." She said, "No, I'm not going to your office. I don't want to discuss this." She wouldn't go into my office...So I took her by the arm, and I said, "Get your ass in my office, now!" She pulled away from me, and she said, "You can't touch me." And I let go of her.

A. ...I let go, and then she turned around to again walk towards the patient area.

A. ...She proceeded into the infusion area, and then she turned around and went and got her purse.

According to Ms. McQuown's deposition testimony of August 2, 2007, the following took place:

A. I walked through the double doors, the glass double doors going across the hall into the other office when Cheryl screamed out, "Nina, get back here."

A. She came from behind me, and I–and the way we entered the office my back was to her office in the front lobby of the second–of, you know, our second office. And she proceeded to scream at me, you know, she goes, "Get in my office right now."

A. And I said, "No, I'm not going into your office right now." And she started screaming profanity at me. She said, "I said to get in my office right now." And she's screaming this. And I'm just frozen there. We're like toe to toe. And I looked at her and I said, "No, I'm not going into that office where you're going to shut the door and continue to scream at me." She goes, "If you don't" and she's yelling like this, "If you don't get in the office right now, You're going to be fired."

A. And I said, "You can't do that. You can't fire me." And she goes, "If you don't get in the office right now, you don't need to come back to work tomorrow, because you will be fired." And she was screaming along with profanity...She was screaming. Her arms were thrashing. Her head was bobbing back and forth. And then all of the sudden she grabbed me with her left hand, my left arm, pulled me toward her, then twisted me around to get me into her office.

Q. Approximately–did she break her hold on you when she grabbed you?

A. When she turned me around, yeah.

Q. Approximately how long did she grab you, how long did she hold your arms?

A. It was long enough to grab me hard, push me towards her, turned me around, I couldn't tell you.

Q. And when she grabbed you–earlier you testified you were standing toe to toe, so she was facing you when she grabbed you?

A. Yeah, she was quite near me. I kept backing up, backing up to the wall.

5

| | |
|---|---|
| ... | |
| Q. | All right, after you broke loose from the grab, what happened next? |
| A. | And I turned around after she grabbed me and I said, "You can't do that, you can't touch someone like that." And then she said, "I can do whatever," you know, and she started with her profanity again. |
| ... | |
| Q. | So what did you do next? |
| A. | Well, we kept talking–I mean she kept, you know, screaming at me and I'm trying to talk to her, and somehow I, you know, worked my way around away from my back being against the office door area, and finally I–I just–I broke away. She's still yelling at me, cussing, you know, throwing, you know...And I broke away and went back to–again, things were spinning... |

Thereafter, a different attorney questioned Ms. McQuown, wherein she testified as follows:

| | |
|---|---|
| Q. | Okay, after saying words to the effect of, "You can't touch me" did you then leave the lobby, reception area, front area of the south office? |
| A. | No. |
| Q. | Okay, was there more interchange between you and Cheryl? |
| A. | Yes. |
| Q. | How long did that interchange last? |
| A. | As she continued yelling and screaming and I somehow worked my way around–we were moving all of the time, she was screaming after she grabbed me. |
| A. | Because I wanted out. So I was, you know, moving backwards. |
| Q. | You were moving backwards edging your way out from the wall; is that right? |
| A. | That corner. |
| Q. | Is that right? |
| A. | Yes. |
| Q. | And my question is how long did the interchange last after she grabbed her arm and turned you around to where you were facing the wall? |
| A. | Maybe another two minutes. |
| Q. | All right. And what you did is you backed your way out of from wherever you were, did you–were you able to separate from Cheryl and get out of the front office area. |
| A. | Eventually. |
| Q. | Okay, how long did it take you to get out of the front office area and separate from Cheryl? |
| A. | The problem is that she kept talking. I kept moving, we kept talking, she |

6

> followed me, she followed me, followed me to where I had an opening, and then I said, "I am out of here" to myself and I just walked off. I was able–I had a clearance to move, because she–I was bottled in there, I couldn't go forwards, I couldn't–the only way I could go was backwards, and that's when the wall was there.

Q. And my question then is how long did it take you to get to that point where you said–you could say, "I'm out of here" after she had taken your arm and turned you 180 degrees to face the wall?

A. Like two, three minutes.

Q. Alright. And then you were able to leave her, you did leave her, correct?

A. Yes.

## **Tender of Defense and Settlement**

On October 13, 2006, Plaintiffs tendered their defense in the underlying action to Maryland. To determine whether there was coverage, Maryland reviewed Ms. McQuown's EEOC complaint and the complaint filed in the Superior Court. On October 25, 2006, Maryland denied coverage and refused to defend Plaintiffs because, according to Maryland, "there is no coverage under the Maryland policy for the claims alleged in the lawsuit." Maryland found, *inter alia*, that the action was excluded under the Employment-Related Practices Exclusion.

Plaintiffs retendered their defense to Maryland on January 4, 2008. At that time, Plaintiffs provided Maryland with a copy of the amended complaint and the cross-complaint filed by Ms. Cardoza. By January 15, 2008, Plaintiffs forwarded to Maryland copies of depositions, documents, and settlement conference statements from the underlying action. In the request for reconsideration, Plaintiffs argued, *inter alia*, that

> although Ms. McQuown's first amended complaint does not include a cause of action for false arrest, detention, or imprisonment, the facts as known to date support this theory or claim by Plaintiff. Specifically, Plaintiff testified and alleged that Ms. Cardoza physically grabbed her, detained her in the office, and that she was fearful as related to this conduct....Further, she said she was backed up against the wall....Plaintiff could potentially establish a claim for false detention by Cardoza.

On January 22, 2008, Maryland informed Plaintiffs that it re-evaluated their coverage position for this claim based on the additional information and stands by their previous denial of coverage. Maryland addressed Plaintiffs' false imprisonment argument in the following way:

7

> [E]ven though Ms. McQuown does not include any allegations of false imprisonment in her original complaint or her first amended complaint, you claim that the facts as known to date support this theory. Maryland disagrees with this assessment. After reviewing all of the material submitted to us by your office, we can see no indication of the restraint necessary to sustain a characterization of false imprisonment. When Ms. Cardoza grabbed her, Ms. McQuown requested that Ms. Cardoza do not touch her and Ms. Cardoza immediately released Ms. McQuown's arm. During the discussion between the two, it continued through one office, in a hallway, and into another office. At all times, it appears that Ms. McQuown had the freedom to just walk away.

On February 1, 2008, Plaintiffs sent Maryland another letter. In the February 1, 2008 letter, Plaintiffs disputed Maryland's position that "it appears that Mrs. McQuown had freedom to just walk away" at all times. On February 7, 2008, Maryland confirmed its decision to deny coverage and refuse to defend Plaintiffs in the underlying action. On February 13, 2008, the underlying action settled. Dr. Perkins and California Oncology paid $90,000 to Ms. McQuown and $85,000 to Ms. Cardoza.

## Procedural History of Instant Action

Plaintiffs initiated this action against Maryland on April 8, 2008 in Fresno County Superior Court. Maryland removed the action to this Court on May 15, 2008. Plaintiffs assert the following two causes of action against Maryland: (1) breach of contract; and (2) breach of the implied covenant of good faith and fair dealing. Maryland moved for summary judgment on February 18, 2009 and Plaintiffs moved for summary judgment on February 24, 2009. The parties filed oppositions to the respective motions on March 13, 2009 and replies on March 20, 2009. Having considered the parties arguments and evidence, the Court found this motion suitable without a hearing, vacated the March 30, 2009 hearing, pursuant to Local Rule 78-230(h), and issues the following order.

### STANDARD OF REVIEW

The parties move for summary judgment.[1] On summary judgment, a court must decide whether there is a "genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[1] In the alternative, Maryland moves for summary adjudication. Pursuant to Fed. R. Civ. P. 56(d), "summary adjudication of only some of the claims imposes a duty on the trial court to 'if practicable' articulate what facts are established and which remain controverted." *Hampton v. Dillard Dept. Stores, Inc.*, 247 F.3d 1091 (10th Cir. 2001), *cert. denied*, 534 U.S. 1131 (2002).

8

323 (1986). The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing of sufficient evidence to establish an essential element of the nonmoving party's claim, and on which the non-moving party bears the burden of proof at trial. *Id*. at 322. "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If the moving party fails to discharge its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes*, 398 U.S. 144, 159-60.

"If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quoting Fed. R. Civ. P. 56(e)). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968) *T.W. Elec. Serv.*, 809 F.2d at 631. The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by depositions, answer to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted). When making this determination, the opposing party's evidence is to be believed and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255.

///

## Discussion

Through the parties' cross-motions, the Court is called upon to determine whether, as a matter of law, Maryland had a duty to defend Plaintiffs in the underlying action. The parties agree that unless otherwise excluded, the Policy granted liability coverage for claims of false imprisonment. The parties dispute whether the facts of the underlying claim gave rise to a potential claim for false imprisonment and/or detention and whether the facts triggered Maryland's duty to defend under the Policy. Additionally, the parties dispute whether a false imprisonment or detention claim falls within the Employment-Related Practices Exclusion of the Policy. The Court considers each argument below.

### **Duty to Defend**

The first question for the Court to resolve is whether Maryland's duty to defend arose and, if so, whether Maryland breached its duty to defend Plaintiffs. An insurer "must defend a suit which *potentially* seeks damages within the coverage of the policy." *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966) (italics in original). "The duty to defend is determined by reference to the Policy, the complaint, and all facts known to the insurer from any source." *Montrose Chemical Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993); *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993). To determine whether an insurer's duty to defend has been triggered, the Court considers the following:

> If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance.

*Scottsdale Ins. Co. v. MV Trans.*, 36 Cal. 4th 643, 655 (2005). "The insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot." *Montrose*, 6 Cal. 4th at 300. "A single claim, even if it does not predominate, but for which there is potential coverage, will trigger the insurer's duty to defend." *Lyons v. Fire Ins. Exchange*, 161 Cal. App. 4th 880, 885 (2008). "Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." *Montrose*, 6 Cal. 4th at 300.

"When determining whether a particular policy provides a potential for coverage," the Court is "guided by the principle that interpretation of an insurance policy is a question of law." *Powerine Oil*

*Co., Inc. v. Superior Court*, 37 Cal.4th 377, 390 (2005). "The insurer is entitled to summary adjudication that no potential for indemnity exists ... if the evidence establishes as a matter of law that there is no coverage." *Id*. (internal citations and quotations omitted).

### False Imprisonment

Plaintiffs contend that the facts of the underlying action create a potential for liability of a false imprisonment claim. In California, false imprisonment is defined as "the unlawful violation of the personal liberty of another." Cal. Pen. Code §236. The California Penal Code definition applies in civil actions. *Parrott v. Bank of America*, 97 Cal. App. 2d 14, 22 (1950). "The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Lyons v. Fire Ins. Exchange*, 161 Cal. App. 4th 880, 888 (2008); *Cervantez v. J. C. Penney Co.*, 24 Cal.3d 579, 592 (1979).

To support the position that there was a potential false imprisonment claim in the underlying action, Plaintiffs rely solely on the following deposition testimony of Ms. McQuown:

Q. Okay, was there more interchange between you and Cheryl?

A. Yes.

Q. How long did that interchange last?

A. As she continued yelling and screaming and I somehow worked my way around–we were moving all of the time, she was screaming after she grabbed me.

A. Because I wanted out. So I was, you know, moving backwards.

Q. You were moving backwards edging your way out from the wall; is that right?

A. That corner.

Q. Is that right?

A. Yes.

Q. And my question is how long did the interchange last after she grabbed her arm and turned you around to where you were facing the wall?

A. Maybe another two minutes.

Q. All right. And what you did is you backed your way out of from wherever you were, did you–were you able to separate from Cheryl and get out of the front office area.

A. Eventually.

11

| | | |
|---|---|---|
| 1 | Q. | Okay, how long did it take you to get out of the front office area and separate from Cheryl? |
| 2 | | |
| 3 | A. | The problem is that she kept talking. I kept moving, we kept talking, she followed me, she followed me, followed me to where I had an opening, and then I said, "I am out of here" to myself and I just walked off. *I was able–I had a clearance to move, because she–I was bottled in there, I couldn't go forwards, I couldn't–the only way I could go was backwards, and that's when the wall was there.* |
| 4 | | |
| 5 | | |
| 6 | Q. | And my question then is how long did it take you to get to that point where you said–you could say, "I'm out of here" after she had taken your arm and turned you 180 degrees to face the wall? |
| 7 | | |
| 8 | A. | Like two, three minutes. |
| 9 | Q. | Alright. And then you were able to leave her, you did leave her, correct? |
| 10 | A. | Yes. |

Plaintiffs interpret the above-quoted passage as evidence that: (1) Ms. McQuown was restricted in her ability to go about her way freely; (2) Ms. McQuown was confined; (2) Ms. McQuown was backed up against a wall and corner; and (4) Ms. McQuown was "bottled in" for an appreciable period of time. Plaintiffs claim that, according to her deposition testimony, Ms McQuown was confined and "bottled in" a corner for two to three minutes. Plaintiffs acknowledge that this passage reflects only a minor portion of Ms. McQuown's testimony, but argue nevertheless that this testimony triggers Maryland's duty to defend Plaintiffs in the underlying action under the Policy.

Maryland argues that Plaintiffs' interpretation of Ms. McQuown's testimony is unreasonable. Maryland contends that the above-cited testimony is consistent with Ms. McQuown's numerous other statements wherein Ms. McQuown describes that she engaged in an argument with Ms. Cardoza, she refused to go to where Ms. Cardoza ordered her to go, and she left when she wanted to leave. Maryland submits that Plaintiffs unreasonably rely on one phrase–"bottled in"–while ignoring Ms. McQuown's consistent statements that she "kept walking" and then "walked off" when she decided to leave. Maryland maintains that Ms. McQuown never testified that she was bottled in the corner or that she was confined for two minutes. As discussed more fully below, this Court disagrees.

When Plaintiffs tendered the defense to Maryland, on October 13, 2006, Ms. McQuown's deposition testimony passage was unavailable. Maryland made its determination upon its review of Ms. McQuown's EEOC complaint and the complaint filed in the Superior Court. Neither document has any

facts that would indicate that Ms. McQuown was confined for an appreciable period of time. Since the extrinsic facts which may create a duty to defense *must be known* by the insurer from the inception of the third party lawsuit, *Montrose*, 6 Cal. 4th at 295-96, the duty to defend did not arise at the time of the tender. Accordingly, Maryland properly denied coverage on October 25, 2006.

Plaintiffs retendered their defense on January 4, 2008. At that time, Plaintiffs provided Maryland with a copy of the amended and a copy of Ms. Cardoza's cross-complaint. On January 15, 2008, Plaintiffs forwarded to Maryland copies of depositions, documents, and settlement conference statements from the underlying action. The duty to defend based on the false imprisonment arose, if at all, at the time Maryland became aware of the deposition testimony relied on by Plaintiffs.

This Court considers the amended complaint and the totality of the extrinsic facts available to Maryland on January 15, 2008 to determine whether a duty to defend arose based on the potential of a false imprisonment claim. The amended complaint asserted causes of action for battery, harassment, wrongful termination, intentional infliction of emotional distress and negligent infliction of emotional distress. Plaintiffs correctly argue that a duty to defend may arise even if Ms. McQuown did not plead a false imprisonment claim. This is because the existence of coverage is not determined by the legal theories alleged against the insured, but instead is determined by the facts which give rise to the potential of liability under the policy. *Gray,* 65 Cal.2d at 276. As pointed out by Maryland, however, the facts alleged in the complaint fail to give rise to a potential liability related to false imprisonment. The amended complaint alleges that Ms. McQuown was subject to "harassment" and an "assault and battery." No alleged facts relate to a confinement or the violation of Ms. McQuown's liberty.

The extrinsic evidence Plaintiffs submitted to Maryland by January 15, 2008, however, raised the possibility of liability based on a false imprisonment claim. "The duty to defend a lawsuit which raises a *possibility* of liability, but is eventually shown to be groundless, does not equate with a duty to defense a lawsuit that raises *no* potential for liability." *Gunderson*, 37 Cal. App. 4th at 1114 (italics in original). The above-quoted testimony of Ms. McQuown creates the *possibility* of a false imprisonment claim. A jury may have agreed with Plaintiffs' interpretation of Ms. McQuown's testimony to conclude that she "was confined, 'bottled in,' the corner for approximately 2-3 minutes, until she was able to escape that physical confinement." While Maryland argues that the weight of the evidence suggests that

Ms. McQuown was not confined or detained for an appreciable period of time, Maryland fails to demonstrate that there was *no* potential for liability based on a false imprisonment claim. The duty to defend "may exist even where coverage is in doubt and ultimately does not develop." *Montrose*, 6 Cal. 4th at 295; *see also, Waller*, 11 Cal. 4th at 19 (duty to defend applies "even to claims that are groundless, false or fraudulent"). "Doubts concerning the potential for coverage, and therefore, the existence of a defense duty must be resolved in favor of the insured." *Safeco Ins. Co. of America v. Parks*, 122 Cal. App. 4th 779, 790 (2004) (citing *Montrose*, 6 Cal. 4th at 299-300). Resolving these doubts in favor of the insured, this Court finds that the underlying action was covered by the Policy, which defines "personal and advertising injury" as "injury, including consequential 'bodily injury' arising out of...False arrest, detention or imprisonment."

## Employment-Related Practices Exclusion

Because the underlying action fell within the scope of the Policy's coverage, this Court considers whether Maryland's Employment-Related Practices Exclusion precluded coverage of the underlying action. The Policy's Employment-Related Practices Exclusion reads:

> This insurance does not apply to:
> "Personal and advertising injury" to:
> (1) A person arising out of any:
>  (A) Refusal to employ that person;
>  (B) Termination of that person's employment; or
>  (C) *Employment-related practices*, policies, *acts* or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person (emphasis added).

Maryland argues that even if Ms. McQuown's deposition testimony triggered the duty to defend based on the potential of a false imprisonment claim, the underlying action was excluded from coverage based on the Employment-Related Practices Exclusion to the "personal and advertising injury" provision of the Policy. Plaintiffs do not dispute that the underlying action is "employment-related." Rather, Plaintiffs argue that the Employment-Related Practices Exclusion is ambiguous and is inapplicable to the underlying action because it does not specifically exclude the "offenses" of "imprisonment or detention." For the following reasons, this Court finds that the Employment-Related Practices Exclusion precludes coverage of the underlying action under the Policy.

///

The term "employment-related" is unambiguous. The clear language of the Policy excludes "personal and advertising injury...arising out of [e]mployment related practices, policies, acts or omissions." The term "employment-related" is not ambiguous even if it is undefined. Several California courts have ruled that similar exclusions are unambiguous. *Low v. Golden Eagle Ins. Co.*, 104 Cal. App. 4th 306, 310-13 (2002); *Frank & Freedus v. Allstate Ins. Co.*, 45 Cal. App. 4th 461 (1996); *Loyola Marymount University v. Hartford Accident & Indemnity Co.*, 219 Cal. App. 3d 1217, 1222 (1990); *General Star Indem. Co. v. Schools Excess Liability Fund*, 888 F. Supp. 1022, 1028 (N.D. Cal. 1995). For example, in *Frank & Freedus*, an insured sued its insurer for failing to provide a defense to a wrongful termination and defamation action asserted by a terminated employee. In affirming summary judgment in favor of the insurer based on, *inter alia*, an employment-related practices exclusion, the Court ruled:

> Nor is the term "employment-related" ambiguous because it is not specifically defined in the policy. The term is not technical in nature. It is used in its ordinary sense, i, e., related to employment. As a term, it modifies the specific acts as well as the terms "practices, policies, acts, or omissions." The clear meaning of the...the exclusion is coverage for practices, policies, acts or omissions which are related to employment, including employment-related defamation.

45 Cal. App. 4th at 471. Here, the term "employment-related" applies to the specific acts illustrated in the exclusion as well as the terms "practices, policies, *acts,* or omissions." Accordingly, this exclusion applies to the employment-related offenses that are defined in the "personal and advertising injury" provision, including false imprisonment.

Additionally, the Employment-Related Practices Exclusion is applicable even though the exclusion does not specifically exclude false imprisonment. The Policy's Employment-Related Practices Exclusion is a broad provision which excludes coverage for personal injury "arising out of any...employment-related practices, policies, acts, or omissions." The Employment-Related Practices Exclusion lists the following *examples* of employment-related practices and acts: "coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person." That list, however, is non-exhaustive, because the list is qualified by the term "such as." "The terms 'including' and 'such as' are illustrative and not limitative." *Harper & Row Publishers, Inc. v. National Enterprises*, 471 U.S. 539, 561 (1985). The term "employment-related" specifically

15

modifies offenses that define "personal injury," including false imprisonment. Thus, although the Court notes that "[e]xclusions from insurance coverage are to be strictly construed," *Zurich Ins. Co. v. Smart & Final, Inc.*, 996 F. Supp. 979, 987 (C.D. Cal. 1998) (citing *Crane v. State Farm Fire and Cas. Co.*, 5 Cal. 3d 112, 115-116 (1971), the language of this exclusion is clear.[2] The Employment-Related Practices Exclusion "excludes coverage for personal injuries resulting from offenses relating to employment." *Loyola Marymount*, 219 Cal. App. 3d at 1223. The Employment-Related Practices Exclusion applies to facts of this case to preclude coverage of the underlying action. Accordingly, Maryland had no duty to defend Plaintiffs in the underlying action.

## **Good Faith and Fair Dealing**

Plaintiffs' second cause of action against Maryland is a breach of good faith and fair dealing with regard to the Policy. This Court has determined that based on the facts alleged and the extrinsic facts of the underlying action, Maryland had no duty to defend Plaintiffs. "A bad faith claim cannot be maintained unless policy benefits are due." *Brizuela v. Calfarm Ins. Co.*, 116 Cal. App. 4th 578, 594 (2004). That is because there can be no liability for bad faith when there is a finding of no coverage. *Waller*, 11 Cal. 4th at 36. Because there was no duty to defend, Plaintiffs' second cause of action fails as a matter of law.

---

[2] Plaintiffs rely on *Zurich Ins. Co. v. Smart & Final, Inc.*, 996 F. Supp. 979, 987 (1998) to argue that the Employment-Related Practices Exclusion is inapplicable. First, the Court notes that the decision of the district court is not binding on this Court. Second, the exclusion at issue in *Zurich* differed from the exclusion in this action. The Zurich exclusion was not "plain and clear" because a "catch-all" phrase followed specific examples of employment-related conduct. The Court found that on that basis, the broad phrase was ambiguous. *Id*. at 988. Here, as explained more fully above, the Court found the language of the exclusion to be unambiguous. Third, the facts in *Zurich* are distinguishable for the instant action. In *Zurich*, Court found that there was no causation between the false imprisonment and the employees ultimate suspension and termination. *Id*. Here, the parties do not dispute that the facts are "employment-related." For these reasons, the Court distinguishes this action from *Zurich*, 996 F. Supp. 979.

## CONCLUSION AND ORDER

For the foregoing reasons, this Court:

1. GRANTS summary judgment in favor of Maryland and against Plaintiffs;
2. DENIES Plaintiffs' summary judgment motion; and
3. DIRECTS the clerk of court to enter judgment in favor of defendant Maryland and against Plaintiffs.

IT IS SO ORDERED.

**Dated:   March 27, 2009**               /s/ Lawrence J. O'Neill
                                          UNITED STATES DISTRICT JUDGE